**FUND FOR ANIMALS,**
et al. **Plaintiffs,**

v.

**U.S. BUREAU OF LAND MANAGEMENT, et al.**
**Defendants.**

No. 01–CV–1903 (RJL).

United States District Court,
District of Columbia.

Sept. 7, 2004.

Howard Mesnikoff Crystal, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Ann D. Navaro, Kristen L. Gustafson, United States Department of Justice, Environment and Natural Resources, Paul A. Mussenden, U.S. Attorney's Office for the District of Columbia, Washington, DC, for Defendants.

## *MEMORANDUM OPINION & ORDER*

LEON, District Judge.

The plaintiffs in this case include two nonprofit organizations dedicated to protecting animals in captivity and in the wild, including wild horses, and four individuals with interest in wild horses. Am. Compl. ¶¶ 3, 7, 12–15. They brought this lawsuit against the Department of the Interior ("DOI"), the Secretary of the Interior (the "Secretary"), the Bureau of Land Management ("BLM"), and the Director of BLM, to challenge the BLM's preparation and implementation of a "Restoration Strategy" regarding wild horses and burros ("wild horses") on public lands. Currently before the Court are plaintiffs' Motion for Summary Judgment and defendants' Cross–Motion for Summary Judgment, or in the Alternative to Dismiss. Upon consideration of the parties' motions, oral argument made by counsel, and the remaining record before the Court, the Court GRANTS the government's Motion to Dis-

miss for lack of subject matter jurisdiction and hereby dismisses this case with prejudice.

## BACKGROUND

In 1971, Congress enacted the Wild Free Roaming Horses and Burros Act ("WHBA"), 16 U.S.C. § 1331, *et seq.*, to protect wild horses and burros in the Western United States. Am. Compl. ¶ 28. The WHBA requires that the Secretary maintain an inventory of the wild horse population for the purpose of, *inter alia*, determining "whether and where an overpopulation exists and whether action should be taken to remove excess animals." 16 U.S.C. § 1333(b)(1). The methods of removal contemplated by the WHBA include natural controls on population levels (*e.g.*, adoption and sterilization) in addition to destruction. *Id.* When the Secretary determines that the herds have become overpopulated,[1] she is authorized under the WHBA to remove enough of the horses so as to "restore a thriving neutral ecological balance to the range, and protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2); Am. Compl. ¶ 37.

The BLM, through its field offices in ten states, has responsibility for managing the wild horse and burro herds in their historical ranges, called Herd Management Areas ("HMA"). Am. Compl. ¶ 38; Def. Mot. for Summ. J. or Dismissal at 1. For some of the HMAs, BLM has identified the number of wild horses that can be sustained in a particular herd area. This figure is referred to as an Appropriate Management Level ("AML"). Am. Compl. ¶ 38. BLM determined that, by the Spring of 2000, 159 of the 192 HMAs were above their AMLs, and that as a result, the wild horses were damaging the range-

---

1. This determination is made based on the inventory of wild horses, along with certain land-use planning data and other relevant information. 16 U.S.C. § 1333(b)(2).

lands and posing a threat to watershed health. Am. Compl. ¶ 43. In response, BLM developed a strategy to manage the wild horse and burro herds entitled "Restoration of Threatened Watersheds, Living Legends in Balance with the Land: A Strategy to Achieve Healthy Rangelands and Viable Herds" (the "Restoration Strategy" or the "Strategy"). Am. Compl. ¶ 44. The Restoration Strategy included a four-year gather and removal schedule designed to remove 12,000 wild horses in the first year across all of the HMAs, an increase from the prior year's removal. Am. Compl. ¶ 46. The Strategy also called for increased numbers of adoptions and the creation of more facilities for holding the wild horses being removed from the HMAs. Am. Compl. ¶ 47. In 2000, BLM received an initial appropriation from Congress to fund the Restoration Strategy. Am. Compl. ¶ 49.

The plaintiffs brought this suit to challenge several aspects of the Restoration Strategy. First, the plaintiffs argue that the actions taken by the government run afoul of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., because BLM failed to prepare an Environmental Impact Statement or an Environmental Assessment on the Restoration Strategy, or to otherwise analyze the environmental impacts of the Strategy as required by the statute.[2] Am. Compl. ¶¶ 50, 90. In addition, the plaintiffs argue BLM also violated NEPA by failing to consider alternatives to the Restoration Strategy or to its methods of quantifying AML. Am. Compl. ¶¶ 51–52.

Second, the plaintiffs argue that the Restoration Strategy violates the WHBA because it calls for removing wild horses to below AML, which the plaintiffs allege is a violation of the WHBA. Am. Compl. ¶¶ 48, 92. Additionally, the plaintiffs allege that BLM is reducing herd sizes to the point that they will not remain viable. Am. Compl. ¶ 93. Because neither WHBA nor NEPA provides for a private right of action, the plaintiffs bring suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, alleging that the government's failure to comply with WHBA and NEPA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); Am. Compl. ¶¶ 89, 92.

Finally, the plaintiffs challenge the legality of six individual removals of wild horses that occurred in 2001 and one removal that was implemented in early 2002.[3] Am. Compl. ¶¶ 54–76, 95–101; Def. Mot. for Summ. J. or Dismissal at 17. The relief sought by plaintiffs includes, *inter alia*, declarations that the defendants are violating WHBA, NEPA, and the APA and an injunction preventing the defendants from further implementing the Restoration Strategy. Am. Compl. Prayer for Relief ¶¶ 1–2. Plaintiffs do not seek any specific relief with regard to the specific gather

---

**2.** NEPA requires such reports for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(C).

**3.** The plaintiffs also filed a claim under the Freedom of Information Act. 5 U.S.C. § 552. On November 19, 2002, plaintiffs filed a stipulation of dismissal with respect to that claim and it is no longer before this Court. On April 29, 2002, plaintiffs filed a motion to amend the complaint to include a claim based on an Instruction Memorandum which was issued by the agency after the administrative record was filed in this case. The amendment was granted. The Instructional Memorandum simply furthers the Restoration Strategy and the arguments put forward by both parties with respect to the Strategy itself apply equally to the Memorandum. For the ease of discussion, the Court does not discuss the Memorandum separately, as its reasoning and conclusions with respect to the Strategy in general are equally applicable to the Memorandum.

and removal actions identified in their complaint.

The defendants argue that this Court lacks subject matter jurisdiction to review the Restoration Strategy under the APA because it is not a final agency action. Defendants further argue that this Court lacks jurisdiction to review the individual gather and removal decisions because they have already been completed and as a result are moot. For the following reasons, the Court agrees with the defendants that the claims presented by the plaintiffs are nonjusticiable and dismisses the case for lack of subject matter jurisdiction.

## DISCUSSION

■ The APA provides for judicial review of agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [4] 5 U.S.C. § 706(2)(A). The plaintiffs must identify a particular "agency action" that caused them harm. "Agency action" is defined by the APA as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Furthermore, the agency action must be *final.* 5 U.S.C. § 704. "Whether there is a final agency action is . . . a jurisdictional question. With a few exceptions, if there is no final agency action, there is no basis for review of the government's decision or policy." *Cobell v. Norton,* 240 F.3d 1081, 1095 (D.C.Cir. 2001). In determining whether a particular agency action was final, this Court must look to "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."

*Franklin v. Mass.,* 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992).

The defendants argue that there has been no " 'agency action,' much less a 'final agency action,' within the meaning of the APA" because the BLM's Restoration Strategy is merely a "planning and budgetary framework—a vehicle used by the agency to pursue successful implementation of past and future wild horse and burro management decisions." Def. Mot. for Summ. J. or Dismissal at 19. The Restoration Strategy merely sets forth: (1) criteria for implementing gathers and removals (*e.g.,* the age of the horses eligible for removal, provisions to train and geld wild horses that are otherwise difficult to adopt, and provisions for long-term pasturing of unadoptable wild horses); (2) a proposed removal schedule; and (3) certain funding requirements necessary to implement that schedule. *Id.* at 13–14. Under the Strategy, each state office then creates its own population models and decides how many wild horses need to be removed from each herd in order to manage AML assuming gathers are conducted at four-year intervals. *Id.* at 14–15. In short, the defendants argue that the Restoration Strategy is a generally applicable planning framework and that the state office decisions as to individual herds would be the proper final agency decisions to challenge under the APA.

The plaintiffs insist, to the contrary, that the Restoration Strategy is a final agency action susceptible to review by this Court because the Strategy is of "general . . . applicability and future effect." Pl. Opp. to Def. Mot. for Summ. J. or Dismissal at 6 (citing 5 U.S.C. § 551(4)). They argue that, by its plain terms, it is binding on all

---

4. The APA provides that "final agency action for which there is no other adequate remedy in a court is subject to judicial review." 5 U.S.C. § 704. Because, NEPA and WHBA do not provide private rights of action to challenge an agency's action (or inaction) under them, the plaintiffs rely on the APA to bring these claims.

of the state office HMA decisions and is properly reviewed by the Court as the final agency action governing the BLM gather and removal decisions.

 The Supreme Court made clear in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), that the final agency action requirement of the APA bars federal jurisdiction over suits for broad programmatic relief.[5] *See also Cobell*, 240 F.3d at 1095; *Sierra Club v. Peterson*, 228 F.3d 559, 567–70 (5th Cir.2000) (en banc), *cert. denied*, 532 U.S. 1051, 121 S.Ct. 2192, 149 L.Ed.2d 1024 (2001). Despite the fact that plaintiffs identify and challenge several individual gather and removal decisions,[6] the Court concludes that what the plaintiffs are primarily seeking is exactly the type of "wholesale improvement" that *Lujan* proscribes. Because further decisionmaking on the part of the BLM's state offices is required prior to any implementation of the Strategy's goals or guidelines,

the Court concludes that the Strategy, simply stated, is not a final agency action. So, despite the fact that any decisionmaking process related to setting the Strategy may in fact be "final,"[7] it is not the type of decision that will directly affect the parties because further agency action is necessary before any concrete action will be taken by the agency that might affect the rights of the plaintiffs. Accordingly, the Court lacks subject matter jurisdiction to review the Restoration Strategy as a general BLM policy.

 Plaintiffs' sole claim challenging certain individual gather and removal actions is likewise nonjusticiable because it is moot. "Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). To establish a justiciable controversy, the plaintiff must have suffered, or be threatened with, an actual injury that is

5. The *Lujan* Court noted that the proper avenue for seeking "wholesale improvement" of a federal program is with the agency itself or with Congress, not in the court system. *Lujan*, 497 U.S. at 891, 110 S.Ct. 3177.

6. Although plaintiffs argue that the individual gather and removal decisions identified in the Complaint were made pursuant to the Strategy, thus making the agency action concrete such that review is appropriate, *see* Pl. Opp. to Def. Mot. for Summ. J. or Dismissal at 16, plaintiffs seek no specific relief with regard to any of these decisions, *see* Am. Compl. Prayer for Relief. In other words, they seem to be using the individual gather and removal actions as *examples* of how the Strategy is implemented as opposed to actions which are causing them injury and from which they seek relief.

7. The *Lujan* decision is instructive on this point. The Court observed that:

Under the terms of the APA, [plaintiff] must direct its attack against some particular "agency action" that causes it harm. Some

statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. *Lujan*, 497 U.S. at 891, 110 S.Ct. 3177. In that case, the program in question was BLM's procedure for reviewing withdrawal revocation applications and classifications of public lands. The program extended to at least 1250 individual applications and classifications. The Court reasoned that the program itself was not a reviewable agency action, and that it was more akin to a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Agency. *Id.* at 890, 110 S.Ct. 3177.

traceable to the defendant and which is capable of being redressed by a favorable judicial resolution. *Id.* If, however, the facts of a case change such that the controversy ends or becomes unredressable, the case becomes moot and the court no longer has jurisdiction over it. Such is the case here, where all seven of the gather and removal decisions were implemented before, or shortly after, plaintiffs instituted this action. Def. Mot. for Summ. J. or Dismissal at 17. Indeed, the seventh gather, at the Buffalo Hills Complex, was modified pursuant to a stipulation between the parties and occurred in early 2002. *Id.* In all seven situations, once the gather was completed and the wild horses were either sold or destroyed there was nothing a court thereafter could do to reestablish the preexisting status quo. Accordingly, since the Court cannot undo what has already been done, the action is moot and the claim challenging the individual gathers is also dismissed. *Friends of the Earth, Inc. v. Bergland,* 576 F.2d 1377, 1379 (9th Cir. 1978), *see also Florida Wildlife Fed'n v. Goldschmidt,* 611 F.2d 547, 548 (5th Cir. 1980) (holding that when plaintiffs allege a violation of NEPA on a government project that has already been completed, the NEPA claim is moot).

### ORDER

For the reasons set forth above, it is this 7th day of September hereby

ORDERED that defendants' Motion to Dismiss [# 38] is GRANTED and that the above captioned case is dismissed with prejudice.

SO ORDERED.