# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 26, 2005        Decided August 18, 2006

No. 04-5359

THE FUND FOR ANIMALS, INC., ET AL.,
APPELLANTS

v.

U.S. BUREAU OF LAND MANAGEMENT, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01903)

*Howard M. Crystal* argued the cause for appellants. With him on the briefs was *Eric R. Glitzenstein.*

*Todd S. Aagaard*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Katherine J. Barton*, Attorney. *Andrew C. Mergen*, Attorney, entered an appearance.

Before: HENDERSON, RANDOLPH, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* GRIFFITH.

RANDOLPH, *Circuit Judge*: The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340, directs the Secretary of the Interior to "protect and manage wild free-roaming horses and burros as components of the public lands." *Id.* § 1333(a). The Fund for Animals and others challenge the Bureau of Land Management's "strategy" for achieving this statutory goal.

I.

The Bureau of Land Management ("BLM" or the "Bureau") "manage[s] the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Since 1971, this responsibility has included oversight and management of wild horses and burros on public lands. Congress passed the Wild Free-Roaming Horses and Burros Act, Pub. L. No. 92-195, 85 Stat. 649 (1971) (the "Act" or the "Wild Horses and Burros Act"), to protect those animals from "capture, branding, harassment, or death." 16 U.S.C. § 1331; *see also Kleppe v. New Mexico*, 426 U.S. 529, 535-36 (1976) (citing legislative history). The Act grants the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Bureau (as the Secretary's delegate) carries out this function in localized "herd management areas" ("HMAs"), 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1, established in accordance with broader land use plans. *Id.* § 4710.1. There are currently 210 herd management areas in ten western states. Responsibility for a particular herd management area rests with the Bureau's local field and state offices.

In each herd management area, the Bureau determines an "appropriate management level" ("AML") for the wild horse and burro populations. 16 U.S.C. § 1333(b)(1). The Bureau describes the appropriate management level as "the median number of adult wild horses or burros determined through BLM's planning process to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular herd area." Local Bureau offices have significant discretion to determine their own methods of computing AML for the herds they manage. Some treat it as the midpoint of a sustainable range, while others treat it as a single number.

When the Bureau determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," the Wild Horses and Burros Act requires it "immediately [to] remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).[1] Before taking such action, the Bureau prepares a detailed "gather" plan, including an environmental assessment in compliance with the National Environmental Policy Act. Gather decisions are subject to administrative appeal. 43 C.F.R. § 4770.3; *id.* pt. 4.

In early 1999, the Bureau recognized that a population explosion among wild horses and burros had rendered it incapable of achieving its statutory goals at then-current funding levels. The nationwide wild horse and burro population was at

---

[1] All young and healthy horses so removed are made available for adoption and transferred to private owners after the owners have demonstrated that the horses or burros will be treated humanely. 16 U.S.C. § 1333(b)(2)(B), (c). Other animals removed from the public lands are destroyed, *id.* § 1333(b)(2)(A), (C), sold in certain circumstances, *id.* § 1333(e), or placed in private long-term pasturing arrangements.

least 46,000 animals or approximately 19,500 animals above nationwide AML. In the face of "mounting distrust and discontent with the BLM's management of the Wild Horse and Burro Program," the Bureau developed a strategy to achieve nationwide AML and justify increased funding for the program. After soliciting advice from state Bureau offices about their specific needs and reviewing several options, the national office settled on a plan that would, if implemented, achieve nationwide AML in five years at a cost of an additional $9 million per fiscal year from 2001 through 2005.

This plan was presented to Congress in February 2000 as a Presidential Budget Initiative. Entitled "The 'Restoration of Threatened Watersheds' Initiative" and subtitled "Living Legends in Balance with the Land: A Strategy to Achieve Healthy Rangelands and Viable Herds," the five-page document informed Congress that "[o]ne of the major threats to watershed health is an overabundance of wild horses and burros on rangelands" and that "at current funding capability and adoption demand" the populations of these animals "will increase at a rate faster than our ability to remove excess animals." The Bureau explained that the additional appropriation would enable the field offices to meet removal targets based on an initial four-year gather schedule. This would result in a large number of removals in the early years of implementation and a gradual decline to maintenance levels. The plan also contemplated eliminating age restrictions on removals,[2] enhanced marketing of animals and adoption events, and an expanded program of training and gelding for difficult-to-adopt animals.

Congress approved the needed funding for the program and the various field offices began implementing individual gathers on a herd-by-herd basis. The field offices used a

---

[2] The Bureau had, in the past, concentrated on removing younger animals in order to maximize adoptions.

common population model to determine how many animals to remove based on an initial four-year gather schedule. This number was just a starting point. The final determinations concerning the number of animals to remove and the timing of such removals was left to the field offices to determine based on the particular characteristics of each herd and geography.

In September 2001, the Fund for Animals, the Animal Legal Defense Fund, and others (collectively the "Fund for Animals" or the "Fund") filed suit in the district court to enjoin the Bureau from continuing to implement the strategy. The complaint alleged that the Bureau violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, by implementing the strategy without first preparing an environmental impact statement, Am. Compl. ¶¶ 89-91, and that the Bureau violated the Wild Horses and Burros Act by adopting a strategy that would reduce herd populations to *below* their appropriate management levels. *Id.* ¶¶ 92-94.[3] The complaint also objected to seven specific gathers of wild horses and burros carried out after Congress appropriated the funds. *Id.* ¶¶ 95-102.

In February 2002, while the complaint was pending, an assistant director of the Bureau issued an "Instruction Memorandum" to the field offices "to communicate guidance and policy" regarding how the Bureau would achieve AML in herd management areas by 2005. The memorandum included a chart containing an "estimate" for each state of the number of horses to be removed; stated that horses five years and younger would be removed first, those ten years and older next, followed by horses six to nine years of age; and outlined the data field offices must collect on each herd in order to prepare "Population

---

[3] The Fund also challenged the Bureau's "pattern, practice and policy of removing wild horses and burros *pursuant to* the Restoration Strategy." Am. Compl. ¶ 103 (emphasis added). Because this claim is not independent of the strategy, we do not address it separately.

Management Plans," which "will detail the population objectives for the herd(s) and the rationale for those objectives." The instruction memorandum stated that it would be "effective for all gathers beginning upon receipt and will expire on September 30, 2003." The Bureau's Manual specifies that instruction memoranda "are of a short-term, temporary nature" and are "in effect for a short period of time." The February 2002 memorandum explained that the Bureau's policy regarding the removal of wild horses is "reviewed and revised each year in an effort to balance the need to achieve AML, minimize the time excess animals are held in BLM facilities awaiting adoption and enhance our ability to place those animals into private maintenance and care."

After the Instruction Memorandum issued, the Fund filed a "Supplemental Complaint" alleging that before the memorandum became effective the Bureau was bound to issue an environmental impact statement or an environmental assessment. The supplemental complaint sought a preliminary and permanent injunction ordering the Bureau not to take any steps to implement the memorandum and directing it to prepare an environmental impact statement pursuant to NEPA.

Insofar as the action dealt with the strategy, the district court dismissed for lack of subject matter jurisdiction, finding that the strategy was not a reviewable "final agency action." *Fund for Animals v. Bureau of Land Mgmt.*, 357 F. Supp. 2d 225, 229 (D.D.C. 2004). As to the specific removal actions, the district court found that the Fund's challenges were moot. *Id.* at 230.

## II.

The Fund takes exception to several of the Bureau's policies for carrying out its wild horse and burro management

duties. The federal courts are not authorized to review agency policy choices in the abstract. In the absence of a specific statutory review provision – neither the Wild Horses and Burros Act nor NEPA contains one – the Administrative Procedure Act provides a generic cause of action to "[a] person suffering legal wrong because of *agency action*, or adversely affected or aggrieved by *agency action*." 5 U.S.C. § 702 (emphasis added). Review under the APA is further limited to "*final agency action* for which there is no other adequate remedy in a court." *Id.* § 704 (emphasis added). Whether there has been "agency action" or "final agency action" within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable.[4] *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005); *DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996).

The Fund cites two documents that it claims are final agency action. One of these documents is the "Instruction Memorandum" issued by the Bureau's Assistant Director for

---

[4] Although the final agency action requirement "has been considered jurisdictional" because, without it, "the court . . . cannot reach the merits of the dispute," *DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996), the APA grants a cause of action rather than subject matter jurisdiction, *see Califano v. Sanders*, 430 U.S. 99, 107 (1977). The district court therefore erred in dismissing the Fund's claim for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1). The error is of no consequence: "[E]ven though there was no basis for dismissal under Rule 12(b)(1), we may properly affirm the District Court's judgment pursuant to Rule 12(b)(6)." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). Because the parties presented "matters outside the pleading," which the district court did not exclude, FED. R. CIV. P. 12(b), the court should have treated the motion to dismiss as a motion for summary judgment.

Renewable Resources and Planning. This memorandum "communicate[s] guidance and policy on how BLM will achieve AML on all HMA's [sic] by 2005." By its terms, the memorandum – a "short-term, temporary" document according to the Bureau's manual – expired on September 30, 2003.[5] In its Supplemental Complaint, the Fund claims only that the memo was issued in violation of NEPA. Because the memo has expired, this claim is moot. *See In re Bluewater Network*, 234 F.3d 1305, 1314 (D.C. Cir. 2000) ("Petitioners do not here challenge the 1997 temporary regulations, either for what they did or did not do; those regulations have expired. Whatever issues could have been raised regarding their legality are moot."); *see also Worth v. Jackson*, 451 F.3d 854, 860-61 (D.C. Cir. 2006). The government's concession that "the general national planning approach set forth in the February 2002 memorandum continues to serve as guidance to the field for the conduct of specific gather and removal decisions," Br. of Appellees at 25 n.6, cannot support the weight the Fund would place on it.[6] The "general national planning approach" is the

---

[5] As the memorandum itself makes clear, the Bureau's selective removal policy regarding wild horses is "reviewed and revised each year in an effort to balance the need to achieve AML, minimize the time excess animals are held in BLM facilities awaiting adoption and enhance our ability to place those animals into private maintenance and care," which is doubtless why the memorandum was in effect for such a short period of time.

[6] Neither can it support our partially dissenting colleague's argument. The government notes that "the record provides no evidence of [the Memorandum's] continued implementation." Br. of Appellees 25 n.6. The absence of record evidence does not create a genuine issue of material fact. This is especially so with respect to questions of mootness. *See, e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002); *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003). The Fund states in a footnote that "BLM has never claimed that it is no longer implementing the . . . Memorandum." Br.

same approach put forward in the budget document, which we discuss next.

This leaves the Fund with the "FY 2001 Presidential Budget Initiative." On its surface, the document was a budget request to Congress. The record confirms that it was intended as such. In the face of mounting pressure to fix systemic problems in the Wild Horse and Burro Program, the Bureau determined that it could do so only with additional funding. The Budget Initiative explains why the current funding amount is insufficient for the Bureau to achieve appropriate management levels. To justify its request for an additional "$9,000,000 [per] year over current funding levels sustained through 2005," the Budget Initiative lays out the key elements of the Bureau's "strategy": a four year gather schedule for all HMAs, removal of animals without age restrictions, a removal target of 12,855 animals in the first year and then a significant drop-off, enhanced marketing of animals and adoption events, training and gelding difficult-to-adopt animals, and long-term pasturing for unadoptable animals. Congress approved this request by appropriating the needed funds in 2001 and 2002.[7] *See* J.A. 101; Dep't of the Interior and Related Agencies Appropriations Act of 2001, Pub. L. No. 106-291, tit. I, 114 Stat. 922, 922-23 (2000); Dep't of the Interior and Related Agencies

---

of Appellants 12 n.4. This is hardly "evidence" that the expiration date does not mean what it says.

[7] This in itself poses a problem for the Fund: If Congress approved an agency program, how can it be that a court should review the program to determine if it complies with federal law? "Congress may ratify an agency action through appropriation acts." *Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (en banc). Because the appropriations here did not identify the wild horses and burros program as a line item, however, we hesitate to read too much into Congress's action. *See id.* at 1290-91 (requiring clear statement of Congressional approval).

Appropriations Act of 2002, Pub. L. No. 107-63, tit. I, 115 Stat. 414, 414-15 (2001).

The Bureau's approved budget request is not "agency action" within the meaning of § 702, much less "final agency action" within the meaning of § 704. The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). This list is expansive. It is "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001). But we "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (internal quotation marks and alteration omitted). Much of what an agency does is in anticipation of agency action. Agencies prepare proposals, conduct studies, meet with Members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs. *Id.*

Budget requests seek funding for an agency to exercise its power. Once Congress appropriates the funds, the agency must determine how to use the money consistent with the appropriation. The agency's proposal to Congress, developed to secure the funds, may serve as a useful planning document, but it is not a "rule" – that is, "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). It does not "implement, interpret, or prescribe" any "law or policy." *See Indep. Equip. Dealers Ass'n*, 372 F.3d at 428; *see also Indus. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1120 (D.C. Cir. 1988). And it is not an "order," or a "license," or a "sanction," or "relief." 5 U.S.C. § 551(13). The most that can

be said is that it outlines the goals and methods of an administrative program. The Wild Horses and Burros Program, according to the "FY2001 Presidential Budget Initiative," proposed rounding up 12,855 animals in its first year, trying to market those animals through adoption events, and so on. Judicial review of such budget initiatives would wreak havoc with the normal operations of agencies and the executive branch. Agencies propose all kinds of programs in the budget process, and they are not the only actors in that process. The President decides which agency budget requests to forward to Congress. *See Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 129-30 (D.C. Cir. 2005). This is doubtless why the Bureau's proposal was called a "Presidential Budget Initiative." It is impossible to believe that the APA opened this process to judicial scrutiny as a reviewable "agency action."

To rule otherwise would be contrary to *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890-94 (1990). Courts may "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." 497 U.S. at 894. The individual roundups might qualify; the Bureau's budget proposal does not. When the Bureau sought funding from Congress, it did not harm or affect the plaintiffs in this case; and they were not harmed or affected when Congress appropriated the $9 million. This is very unlike a substantive rule that, as a practical matter, requires the parties affected to adjust their conduct as soon as the rule is issued. The budget request is a broad "programmatic" statement that *Lujan* keeps from our review. *Id.* at 891.

Unlike "circumscribed, discrete agency actions" that are the ordinary subjects of judicial review, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004), the Bureau's strategy represents the sum of "many individual actions," including some "yet to be taken." *Lujan*, 497 U.S. at 893; *see*

*also Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001); *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 595 (D.C. Cir. 2001). The Fund identifies four "elements" of the Budget Initiative that it claims "require specific agency conduct": removing animals to achieve AML in *all* HMAs, implementing a four-year gather schedule, removing animals regardless of age, and reducing populations to forty percent below AML. Even if the Bureau's budget request were somehow considered to be a regulation – the Bureau disputes that these "elements" of the strategy are binding upon the field offices actually making gather decisions – there must still be "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan*, 497 U.S. at 891. As we have said, the cited "elements" had no such consequence.[8]

The budget proposal represents the Bureau's latest plan to comply with its broad statutory mandate. The Supreme Court addressed an analogous situation in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 61-65.[9] The Court reiterated the point that before there may be judicial review there must be a "discrete" "agency action." *Id.* at 62, 64. In a portion of the

[8] The budget initiative is therefore quite unlike the policy guidance we reviewed in *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000). EPA's guidance document amounted to a legislative rule – subject to notice-and-comment rulemaking – because it required the parties affected to adjust their conduct as soon as it was announced. *See id.* at 1023, 1028.

[9] Although the complainants in *Southern Utah* sought to compel agency action allegedly withheld, *see* 5 U.S.C. § 706(1), the Court's reasoning applies with equal force to claims regarding action taken under § 706(2). The Court stated that the requirement of discrete "agency action" is the same regardless whether a plaintiff challenges alleged action taken or withheld. *See Southern Utah*, 542 U.S. at 64-65.

opinion that almost seems to anticipate this case, the Court hypothesized a plaintiff who alleged "that the Secretary had failed to 'manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance.'" *Id.* at 67 (quoting 16 U.S.C. § 1333(a)). "The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives," the Court stated, "is not contemplated by the APA." *Id.* Yet that is precisely the step that the Fund asks us to take in this case.

Both *Lujan* and *Southern Utah* were suits challenging land use plans formulated pursuant to the Federal Land Policy and Management Act of 1976, and the Act's mandate to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). The Court held that the plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny. "[A] land use plan is generally a statement of priorities; it guides and constrains actions, but does not . . . prescribe them." *Southern Utah*, 542 U.S. at 71. The Wild Free-Roaming Horses and Burros Act thus directs the Secretary to manage the animals "as an integral part of the natural system of the public lands," 16 U.S.C. § 1331, "to achieve and maintain a thriving natural ecological balance on the public lands," *id.* § 1333(a), and to "preserve and maintain . . . [a] multiple-use relationship" with the land, *id.* § 1332(f)(2). The Bureau carries out its wild horse and burro management duties as part of the broader land use planning process. *See* 43 C.F.R. § 4700.0-2 ("The objectives [of the program] are management of wild horses and burros . . . under the principle of multiple use . . . ."); *id.* § 4700.0-6(b) ("Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans."); *id.* § 4710.1 ("Management activities affecting wild horses and burros . . . shall be in accordance with approved

land use plans . . ..").  The budget initiative reflects land use planning.  It contains the outlines of a reinvigorated wild horses and burros program and sets broad goals and strategies.  Like the land use plans in *Lujan* and *Southern Utah*, it is "[a] statement by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities."  *Southern Utah*, 542 U.S. at 71.  As such, it "cannot be plucked out of context and made a basis for suit" under the APA.  *Id.*

Our conclusion that the Bureau's budget request is not reviewable under the APA is of a piece with this court's consistent refusal to review agency orders "that do[] not [themselves] adversely affect complainant but only affect[] his rights adversely on the contingency of future administrative action."  *DRG Funding Corp.*, 76 F.3d at 1214 (internal quotation marks omitted); *see, e.g., Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-33 (D.C. Cir. 2003); *AT&T Co. v. EEOC*, 270 F.3d 973, 975-76 (D.C. Cir. 2001).  As is the case with more formal land use plans, there is "considerable legal distance" between the appropriation of funds to implement a gather "strategy" and the actual removal of wild horses and burros.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 730 (1998).  The field office responsible for a particular herd management area must conduct its own surveying and land use planning; it must propose a gather and provide notice to interested parties; if those parties object, it must consider their objections and render a decision.  Although the "strategy" likely guides this process, it does not carry the legal significance the Fund assigns to it.  The elements of the strategy to which the Fund objects "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations."  *Id.* at 733.  Our long-standing practice in circumstances like this is to

require the complaining party to challenge the specific implementation of the broader agency policy.

### III.

The Fund's complaint did object to seven specific gathers allegedly carried out "in accordance with the Restoration Strategy." Am. Compl. ¶¶ 95-102. The Fund requested relief – "permanently enjoining [the Bureau] from taking any further steps to implement its Restoration Strategy," *id.* at 30 – that can fairly be read to include an injunction against carrying out the specified removal actions. But those gathers have been completed. It is "impossible for the court to grant any effectual relief whatever" with respect to the challenged gathers. *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 950 (D.C. Cir. 2005) (internal quotation marks omitted). They cannot be undone.

This aspect of the case cannot be saved from mootness on the ground that it raises "issues or wrongs capable of repetition yet evading review."[10] *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 421 (D.C. Cir. 2005) ("*PETA*") (internal quotation marks omitted). Particular decisions to remove wild horses and burros are highly fact-specific. How a herd will be managed in the future after the initial culling is anyone's guess, as the Bureau makes clear. It may depend on climate, on how many new births occur, on the mortality rate of the horses, on whether fertility control is used as a management tool, and on many other factors specific to a herd and to the area in which it is located. Once appropriate

---

[10] Although the Fund did not press this specific exception to the mootness doctrine in the district court, it did so in this court. As the Bureau rightly conceded at oral argument, this court has authority to address the exception as a matter of our Article III jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

management levels have been achieved, the "schedule for maintaining those AMLs will be developed based on the individual needs of each herd." If there are to be more roundups in the future – itself an open question – it remains to be seen whether they will be of the same magnitude as those which have come before, and whether the same criteria are applied. As in *PETA*, the "essential point is that the case before us is highly dependent upon a series of facts unlikely to be duplicated in the future," *id.* at 424, particularly since the 2001 budget request proposed only a four-year gather program.

\* \* \*

Because the Fund does not challenge any justiciable agency action, the judgment of the district court is affirmed.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring in part and dissenting in part:

The majority devotes almost all of its analysis, *see* Maj. Op. at 9-15, to deciding whether an agency's budget request to Congress constitutes "final agency action" under the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 704. I agree fully with the majority that a budget request made by a federal agency to Congress, in and of itself, is not subject to judicial review under the APA.

The majority gives short shrift, however, to what happened after Congress appropriated the funds requested by the Bureau of Land Management ("BLM"). Through the Wild Free Roaming Horses and Burros Act ("WHBA" or the "Act"), 16 U.S.C. § 1331, *et seq.*, Congress has given the BLM a broad mandate: "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," 16 U.S.C. § 1333(a). After completing an extensive review of its management of wild horses and burros throughout the American West, and receiving funds to pursue a new course, the BLM's central leadership in Washington, D.C. issued "Instruction Memorandum No. 2002-095" (the "Instruction Memorandum" or "Memorandum"), which sets out the agency's final plan for the Restoration Strategy and the specific standards field employees are to use in managing wild horses through the year 2010. Specifically, the Memorandum sets forth the particular types and quantities of horses that agency employees are to remove under the BLM's current interpretation of the WHBA.

The majority never squarely addresses whether the Instruction Memorandum constitutes final agency action, *see* Maj. Op. at 8, and instead devotes its analysis to the agency's earlier budget request, *see id.* at 9-15. But at base, this case is nothing more than a rather ordinary request for review of regulatory criteria promulgated by an agency in carrying out a

congressional mandate. A preliminary budget request sent to Congress surely does not constitute final agency action, but that request does not immunize from judicial review an agency's later, final order implementing its statutory authority.

To resolve the Fund's claim predicated upon the Memorandum, the majority raises a mootness issue *sua sponte*, but without providing the parties an opportunity to respond. The majority concludes that, as a matter of law, an expiration date printed on the Memorandum makes it "doubtless . . . [that] the [M]emorandum was [only] in effect for . . . a short period of time," Maj. Op. at 8 n.5, despite the BLM's acknowledgment in its brief that it "does not dispute . . . that the general national planning approach set forth in the . . . [M]emorandum continues to serve as guidance to the field for the conduct of specific gather and removal decisions," Appellees' Br. at 25 n.6. In the majority's view, it is "doubtless" that the Fund's claim is moot even where other terms of the Memorandum purport to provide the agency's governing interpretation of the Act through the year 2010.

As the Government notes in its brief, no party has developed a record on the majority's expiration argument, *see* Appellees' Br. at 25 n.6, because no party has made that argument. As we have said before: "'The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" *United States v. West*, 392 F.3d 450, 459 (D.C. Cir. 2004) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)). The majority runs afoul of that maxim by dismissing the Fund's claim on mootness grounds absent any development of that issue by the parties.

Undoubtedly, even where "no party asserts that the case is . . . moot, we are obliged to address the issue *sua sponte* because

mootness goes to the jurisdiction of this court." *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1522 (D.C. Cir. 1994) (citing *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (per curiam)). With respect to fact-dependant jurisdictional issues, however, "it is our general practice to allow full development and presentation in the district court of matters that surface initially on appeal" and "[w]e . . . therefore remand . . . to the district court for a current ruling on whether . . . threshold Article III requirements are satisfied." *Women's Equity Action League v. Bell*, 743 F.2d 42, 44 (D.C. Cir. 1984) (citing *Dandridge v. Williams*, 397 U.S. 471, 475-76 n. 6 (1970)) (internal citation omitted).

By not following that general practice of allowing the parties to fairly join this issue, the majority ends this case on mootness grounds despite the BLM's concession that the "general national planning approach set forth in the February 2002 [M]emorandum continues to serve as guidance to the field," Appellees' Br. at 25 n.6, and that the Restoration Strategy, which the Instruction Memorandum by its terms implements, *see* Joint Appendix ("JA") at 113, 118, is "intended . . . to provide guidance for the national wild horse and burro program *for some unspecified period of time*," Appellees' Br. at 28 (emphasis added). The Instruction Memorandum was doubtless in effect when the parties briefed summary judgment in the District Court. The BLM represents in its brief, however, that its Instruction Memoranda are "reviewed annually." *Id.* at 25. That annual reviewing process, combined with the fact that the agency acknowledges that it still follows the approach set forth in the Memorandum, suggests that either this Memorandum is still in effect or the agency has issued another memorandum setting forth the same, continuing legal interpretation of the WHBA. The parties will have no chance to develop that issue, however, because the majority has declined to allow the parties an opportunity to develop a record on mootness.

4

The majority, citing to the summary judgment standard, concludes that there is no "genuine issue of material fact" regarding whether the Memorandum is moot. *See* Maj. Op. at 8-9 & n.6. At summary judgment, however, we are to "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)). There appears to be "evidence" that the "expiration date does not mean what is says," Maj. Op. at 9 n.6 (quotation marks omitted), where, as discussed below, the Memorandum by its terms provides instructions to BLM field employees for the years 2006, 2007, 2008, 2009, and 2010—years that are hardly moot—and where the BLM acknowledges that the Strategy, which the Memorandum sets forth, was "intended . . . to provide guidance for the national wild horse and burro program for some unspecified period of time." Appellees' Br. at 28.

But the majority's "no evidence" argument is a red herring. Even if the majority were correct on that score, it would hardly be surprising that a record would be incomplete on an issue never raised or challenged by any party. Although it is true that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment," that is only so "as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *see, e.g.*, *Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) (this "court has long recognized that a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion") (quoting *Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir. 1987)). The majority's *sua sponte* grant of summary judgment for "[t]he absence of record evidence," Maj. Op. at 8

n.6, is particularly problematic because it comes on appeal, with the Fund having had no notice of the majority's argument or possibility of seeking discovery or introducing evidence in response. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1537 & n.163 (D.C. Cir. 1984) (en banc) ("Unless the new issue uncovered by the appellate court was one which was clearly framed by the proceedings below so that the parties had a legitimate chance to submit all relevant materials and argue their implications, it is clearly unjust for the appellate court to direct the issuance of summary judgment on a new issue raised *sua sponte* on appeal.") (collecting citations), *vacated on other grounds*, 471 U.S. 1113 (1985).

The very legal authority relied upon by the majority shows where the majority errs. Contrary to the majority's suggestion, it is the BLM—and not the Fund—that bears the burden, at this stage, of demonstrating that the Agency has abandoned the course set forth in the Memorandum. *See* Maj. Op. at 8 (relying upon *Worth v. Jackson*, 451 F.3d 854, 860 (D.C. Cir. 2006); *In re Bluewater Network*, 234 F.3d 1305, 1314 (D.C. Cir. 2006)). As we recently noted in *Worth*:

> "it is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" except when the defendant meets its "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again."

451 F.3d at 860 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (alterations omitted)) (quotation marks and alteration omitted). True, as the majority suggests, an agency can abandon its own guidance and no longer follow a memorandum with an expiration date. But the record does not establish, at this stage, that the Instruction Memorandum has been withdrawn. The BLM has not attempted

to meet its "heavy burden," *see Laidlaw*, 528 U.S. at 189, of persuading this Court that it will not continue to follow the Instruction Memorandum—because it concedes, contrary to the majority's suggestion, that it *does* continue to follow "the general national planning approach set forth in the . . . [M]emorandum." Appellees' Br. at 25 n.6. If given a chance to develop the majority's mootness issue in the District Court, the BLM would be able to advise on which parts of the Instruction Memorandum it follows, and the Fund would be able to address, and develop a record on, whether any recent BLM Instruction Memoranda evidence that the BLM continues to follow the same approach the Fund challenges. But despite the substantial resources invested in this litigation, and despite our general approach of remanding such fact-intensive Article III issues that have gone previously unchallenged, this case ends today without any of the parties having been given a chance to address mootness. Instead, the parties are left with one paragraph from the majority asserting mootness, *see* Maj. Op. at 7-9, and the BLM is not held to meeting its "heavy burden," *see Laidlaw*, 528 U.S. at 189, of demonstrating that the Fund's claim is moot.

Given the BLM's acknowledgment that it still follows the "general national planning approach" set forth in the Memorandum, Appellees' Br. at 25 n.6, it is clear, however, that this approach—whether distributed to field employees through the Instruction Memorandum or a version of the Memorandum with a new expiration date—constitutes "final agency action" under the precedent of both the Supreme Court and this Circuit, *see* 5 U.S.C. § 704. As the Supreme Court has reminded us, "[t]he particular label placed upon [an agency order] by [an agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive." *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942); *see also, e.g.*, *Croplife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (same); *General Elec. Co. v. EPA*, 290 F.3d

377, 383-85 (D.C. Cir. 2002) (same); *Envtl. Def. Fund v. Gorusch*, 713 F.2d 802, 816 (D.C. Cir. 1983) (same); *Chamber of Commerce of U.S. v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980) (same).

"Our cases . . . make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *General Elec.*, 290 F.3d at 383 (internal citations omitted) (citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988)). As the BLM's concession indicates, the latter is certainly present here: BLM employees in the field still must follow this agency directive. Even with respect to the first category, the Instruction Memorandum the majority holds has been withdrawn appears on its face to still be binding, or there is at least a question of fact to be resolved on that score. Although given scant attention by the majority opinion, the text of the Memorandum provides:

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

\* \* \*

Instruction Memorandum No. 2002-095
Expires: 09/30/2003

> To: All Field Officials (except Alaska)

> From: Assistant Director, Renewable Resources and Planning

> Subject: Gather Policy & Selective Removal Criteria for Wild Horses

* * *

To achieve and maintain [appropriate management levels ("AML")] on all [herd management areas ("HMAs")] a four year gather cycle *will be followed* for each HMA.

* * *

| Fiscal Year | 2001 | | 2002 | | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | Target | Actual | Target | AWP | Target | Target | Target | Target | Target | Target | Target | Target |
| AZ | 600 | 646 | 600 | 640 | 326 | 290 | 290 | 290 | 290 | 290 | 290 | 290 |
| CA | 1949 | 2021 | 1678 | 1410 | 729 | 249 | 654 | 400 | 458 | 177 | 564 | 262 |
| CO | 25 | 318 | 452 | 330 | 115 | 0 | 0 | 419 | 67 | 0 | 0 | 418 |
| ID | 235 | 163 | 68 | 110 | 0 | 368 | 91 | 43 | 0 | 387 | 88 | 43 |
| MT | 0 | 46 | 121 | 0 | 0 | 0 | 0 | 74 | 0 | 0 | 0 | 80 |
| NV | 5222 | 6329 | 6322 | 7667 | 6095 | 6085 | 3365 | 1727 | 3011 | 2287 | 2557 | 1557 |
| NM | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OR | 833 | 692 | 709 | 735 | 213 | 288 | 723 | 336 | 283 | 422 | 732 | 285 |
| UT | 1990 | 794 | 701 | 715 | 867 | 624 | 887 | 353 | 509 | 268 | 792 | 337 |
| WY | 2001 | 1995 | 837 | 1650 | 1337 | 1208 | 960 | 301 | 582 | 550 | 1005 | 266 |
| Totals | 12855 | 13019 | 11488 | 13257 | 9682 | 9112 | 6970 | 3943 | 5200 | 4381 | 6028 | 3538 |

Budget projections for achieving and maintaining AML were based on these removal rates. It is important that each state schedule gathers based on these removal targets *as closely as possible* so that the overall program will stay within budget projections. . . . Any changes from this schedule will have to be coordinated with WO-260 and approved by the Assistant Director for Renewable Resources and Planning (AD-200).

JA at 113-14 (emphasis added). After directing field employees

to meet those "removal rates" through the year 2010 "as closely as possible," the Instruction Memorandum proceeds to set out "selective removal requirements" that "are *in effect* for *all* wild horses to be placed into BLM's national adoption program or long term holding facilities." *Id.* at 115 (emphasis added). According to those requirements, "wild horses *will be removed* from within HMAs in the following priority order:"

**1. Age Class Five Years and Younger**

Wild horses five years of age and younger *may be removed* and placed into the national adoption program.

**2. Age Class Ten Years and Older**

Wild horses ten years of age and older *will be removed* and placed into long term holding.

* * *

**3. Age Class Six to Nine Years**

Wild horses aged six to nine years old *should be removed* last and only if the HMA cannot achieve AML without their removal.

*Id.* at 116 (emphasis added). The Memorandum provides animals will be "unadoptable" if they have "disease[s]; serious congenital or genetic defects; physical defects due to previous injuries; recent, but not life threatening injuries; or other factors that may prevent adoption." *Id.* Such animals "will" be "[r]eleased in an HMA (if defects or disease would not likely compromise [the] existing herd[])" or, alternatively, "[d]estroyed if the humane destruction criteria . . . are satisfied." *Id.*

It serves only a limited purpose for me to address the BLM's

arguments why the Instruction Memorandum does not constitute final agency action under the APA, given that the majority disposes of this issue on its own expiration ground. The BLM argues that the Memorandum (1) does not represent "the consummation of the agency's decisionmaking process about the gather and removal of animals from the public lands" because field officers have "further flexibility at the project-specific level" as to which specific animals within individual herds to remove, Appellees' Br. at 26; (2) contains only flexible guidelines for field officers to apply in choosing which horses to remove, *id.* at 27-28; and (3) is merely for "internal use by BLM employees and has no binding legal force or effect," *id.* at 25-26 (quotation marks omitted).

In *Bennett v. Spear*, the Supreme Court set forth a two-part test for determining what constitutes "final agency action" under section 704 of the APA: "[f]irst, [an] action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," 520 U.S. 154, 177-78 (1997) (quotation marks and internal citation omitted), and "second, [an] action must be one by which rights or obligations have been determined, or from which legal consequences will flow," *id.* at 178 (quotation marks omitted). The BLM's Instruction Memorandum meets that test. The record reveals that the Memorandum was the result of a comprehensive decisionmaking process. After studying for some time the number of wild horses and burros living throughout the West, the BLM concluded in Spring 2000 that numerous areas were significantly overpopulated. Implementing the BLM's statutory authority under the WHBA to manage overpopulation, BLM officers set out to develop the Restoration Strategy. *See* Maj. Op. at 3-5. In determining how to remedy overpopulation, the BLM consulted with the Wild Horse and Burro Advisory Board—a congressionally-provided board of experts, *see* 16 U.S.C. § 1337; all of its wild horse and burro specialists;

participants at two national wild horse and burro meetings; and finally the public. The Memorandum specifically indicates that "[t]his review *has been completed*" and that "all comments [were] considered" prior to issuing the Memorandum. JA at 118 (emphasis added).

Thus, in the BLM's own words, agency *leadership* "completed," *id.*, the BLM's decisionmaking process regarding the criteria to be used for removing wild horses and burros. True, as the agency argues before us, BLM employees in the field must now apply those criteria and remove specific animals. But decisions by individual field employees as to which individual horses to remove are not the "consummation of the agency's *decisionmaking* process." *Bennett*, 520 U.S. at 178 (emphasis added). They are nothing more than a field employee's application of the *BLM's* decision.

Under the second part of the *Bennett* test, an agency action is not final, and thus subject to judicial review under the APA, unless it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (quotation marks omitted). Time and again, we have turned, ultimately, to the impact guidance has on an agency, *see Bennett*, 520 U.S. at 177-78, a petitioner, *see, e.g.*, *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000), or both, *see Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005). Where agency guidance alters the obligations of either, we have found final agency action. The Instruction Memorandum affects both. The Memorandum requires "All Field Officials (except Alaska)," JA at 113, to adhere "as closely as possible," *id.* at 114, to the number of horses it requires to be removed. It sets binding criteria for the types of wild horses that "will be removed." *Id.* at 116. Indeed, in the subsequent years since the Memorandum was issued for which the record describes how many horses were removed, field employees appear to have closely adhered to the

Memorandum's directives. *Id.* at 82-83, 158-59. Field employees must follow that Memorandum, and members of the Fund can no longer study and view the number and types of wild horses and burros they believe lawful agency action would otherwise allow. *See id.* at 85, 91-92, 95, 113-16.

This case is no different from *Bennett* itself. There, the Supreme Court examined an opinion letter of the U.S. Fish and Wildlife Service setting forth activities that would jeopardize an endangered species and concluded it was "final agency action" because another agency, the Bureau of Reclamation, had agreed to be bound by that letter. 520 U.S. at 178. Because the opinion letter had "direct and appreciable legal consequences," it was final agency action subject to review under section 704 of the APA. *Id*. Just as in *Bennett*, before us now is a written "[s]tatement [that] alter[s] the legal regime to which the action agency is subject, authorizing [an official] to take the [animal] if (but only if) [the official] complies with the prescribed conditions." *Id.* The Memorandum sets forth the legal obligations of BLM field offices for fulfilling the BLM's duties under the WHBA, requiring them to gather and remove wild horses and to do so by complying with the criteria set out in the Memorandum. It requires BLM field employees to follow the agency's interpretation of the WHBA and has "direct and appreciable legal consequences." *Id.* at 178. Indeed, the Strategy determines how an act of Congress will govern wild horses and burros throughout the American West for the foreseeable future—what the BLM calls in its brief "some unspecified period of time." Appellees' Br. at 28. About the only difference between the Fish and Wildlife Service's opinion letter authorizing the taking of fish in *Bennett* and the BLM's Memorandum authorizing the taking of horses in this case is that one involved fish and the other wild horses. That cannot be a difference of any moment.

Nor does *Lujan v. National Wildlife Federation*, 497 U.S.

871 (1990), counsel a contrary result.  In *Lujan*, the Supreme Court rejected an effort by several environmental groups to challenge a broad set of BLM actions not limited to "a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id*. at 890.  In *Lujan*, there was no discrete program to review.  Environmental groups simply took issue with all operations of the BLM conducted pursuant to one statute.  The groups failed to allege "'agency action' within the meaning of [5 U.S.C.] § 702, much less a 'final agency action' within the meaning of [5 U.S.C.] § 704." *Id.*  In contrast, appellants here do not ask the Court to review BLM activities at a general level; they ask us to determine the legality of a clearly defined, discrete agency interpretation of a statute.  Unlike *Lujan*, this is not an attack on the day-to-day decisionmaking of an agency cloaked in the language of the APA; instead, it is a rather ordinary review of criteria created by an agency to carry out its statutory obligation.

Not long ago, we summarized this trend of agencies attempting to abandon notice and comment rulemaking under the APA and instead seeking to define the scope of their powers through continually-issued agency memoranda:

> The phenomenon we see in this case is familiar. Congress passes a broadly worded statute.  The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like.  Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on.  Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities.  Law is made, without notice and comment, without public

> participation, and without publication in the Federal Register or the Code of Federal Regulations. With the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its web site. An agency operating in this way gains a large advantage. It can issue or amend its real rules, *i.e.*, its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures. The agency may also think there is another advantage—immunizing its lawmaking from judicial review.

*Appalachian Power*, 208 F.3d at 1020 (quotation marks and internal citation omitted). The same phenomenon occurs here today. At issue is a broad congressional mandate: "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Although agencies subject to similar mandates and promulgating similar memoranda nonetheless had to face judicial review in *Appalachian Power*, *Bennett*, and numerous other cases, today the BLM's interpretation of the Wild Free Roaming Horses and Burros Act escapes review.

Under the majority's decision, to obtain any relief, appellants will most likely have to challenge every specific removal of horses by individual field employees. Horses can be removed from the public lands, however, faster than cases can proceed through the public's judicial dockets. Ordinarily, litigants faced with such a dilemma would seek to apply the "capable of repetition yet evading review" exception to mootness. *See* Maj. Op. at 15 (quotation marks omitted). The majority concludes that this exception cannot grant appellants relief with respect to the specific removals they challenge

because "[h]ow a herd will be managed in the future after the initial culling is anyone's guess." *Id.* Appellants are thus dealt a double whammy under the majority's decision: they cannot challenge the BLM's legal interpretation of the WHBA set forth in its Instruction Memorandum to field employees, and yet they also cannot challenge specific removals of wild horses. Under the majority's reasoning, for a litigant seeking to challenge the lawfulness of the BLM's actions in managing the Nation's wild horses and burros, "final agency action," 5 U.S.C. § 704, can only be final in theory, but never in fact.

What the majority calls the "initial culling," however, is set to continue through the year 2010, *see* Dissent at 8, pursuant to specific criteria promulgated in the Instruction Memorandum, *id.* at 9. According to the BLM itself, the "approach set forth in the . . . [M]emorandum continues to serve as guidance to the field for the conduct of specific gather and removal decisions." Appellees' Br. at 25 n.6. I thus see no record basis for the majority's suggestion that future removals of wild horses and burros from the public lands will not share significant—if not identical—factual and legal issues with past removals, given that field employees must continue to follow the "approach set forth" in the Memorandum. For the foregoing reasons, I respectfully dissent.