Opinion for the Court filed by Circuit Judge RANDOLPH.
Opinion concurring in part and dissenting in part filed by Circuit Judge GRIFFITH.
RANDOLPH, Circuit Judge.
The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340, directs the Secretary of the Interior to “protect and manage wild free-roaming horses and burros as components of the public lands.” Id. § 1333(a). The Fund for Animals and others challenge the Bureau of Land Management’s “strategy” for achieving this statutory goal.
I.
The Bureau of Land Management (“BLM” or the “Bureau”) “managefs] the public lands under principles of multiple use and sustained yield.” 43 U.S.C. § 1732(a). Since 1971, this responsibility has included oversight and management of wild horses and burros on public lands. Congress passed the Wild Free-Roaming Horses and Burros Act, Pub.L. No. 92-195, 85 Stat. 649 (1971) (the “Act” or the “Wild Horses and Burros Act”), to protect those animals from “capture, branding, harassment, or death.” 16 U.S.C. § 1331; see also Kleppe v. New Mexico, 426 U.S. 529, 535-36, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (citing legislative history). The Act grants the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to “manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.” 16 U.S.C. § 1333(a). The Bureau (as the Secretary’s delegate) carries out this function in localized “herd management- areas” (“HMAs”), 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1, established in accordance with broader land use plans. Id. § 4710.1. There are currently 210 herd management areas in ten western states. Responsibility for a particular herd management area rests with the Bureau’s local field and state offices.
*16 In each herd management area, the Bureau determines an “appropriate management level” (“AJVIL”) for the wild horse and burro populations. 16 U.S.C. § 1333(b)(1). The Bureau describes the appropriate management level as “the median number of adult .wild .horses or burros determined through BLM’s planning process to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular herd area.” Local Bureau offices have significant discretion to determine their own methods of computing AML for the herds they manage. Some treat it as the midpoint of a sustainable range, while others treat it as a single number.
When the Bureau determines “that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals,” the Wild Horses and Burros Act requires it “immediately [to] remove excess animals from the range so as to achieve appropriate management levels.” 16, U.S.C. § 1333(b)(2).[1] Before taking such action, the Bureau prepares a detailed .“gather” plan, including an environmental assessment in compliance with the National Environmental Policy Act. Gather decisions are subject to administrative appeal. 43 C.F.R. § 4770.3; id. pt. 4.
In early 1999, the Bureau recognized that a population explosion among wild horses and burros had rendered it incapable of achieving its statutory goals at then-current funding levels. The nationwide wild horse and burro population was at least 46,000 animals or approximately 19,-500 animals above nationwide 'AML. In the face of “mounting distrust and discontent with the BLM’s management of the Wild Horse and Burro Program,” the Bureau developed a strategy to achieve nationwide AML and justify increased funding for the program. After soliciting advice from state Bureau offices about their specific needs and reviewing several options, the national office settled on a plan that would, if implemented, achieve nationwide AML in five years at a cost of an additional $9 million, per fiscal year from -2001 through 2005.
This plan was presented to Congress in February 2000 as a Presidential Budget Initiative. Entitled “The ‘Restoration of Threatened Watersheds’ Initiative” and subtitled “Living Legends in Balance with the Land: A Strategy to Achieve Healthy Rangelands and Viable Herds,” the five-page document informed Congress that “[o]ne of the major threats to watershed health is an overabundance of wild horses and, burros on rangelands” and that “at current funding capability and adoption demand” the populations of these animals “will increase at a rate faster than our ability to remove excess animals.” The Bureau explained that the additional appropriation would enable the field offices to meet removal targets based on an initial four-year, gather schedule. This would result in a large number of removals in the early years of implementation and a gradual decline to maintenance levels. The plan also contemplated eliminating age restrictions on removals,[2] enhanced marketing of animals and adoption events, and an *17 expanded program of training and gelding for difficult-to-adopt animals.
Congress approved the needed funding for the program and the various field offices began implementing individual gathers on a herd-by-herd basis. The field offices used a common population model to determine how many animals to remove based on an initial four-year gather schedule. This number was just a starting point. The final determinations concerning the number of animals to remove and the timing of such removals was left to the field offices to determine based on the particular characteristics of each herd and geography.
In September 2001, the Fund for Animals, the Animal Legal Defense Fund, and others (collectively the “Fund for Animals” or the “Fund”) filed suit in the district court to enjoin the Bureau from continuing to implement the strategy. The complaint alleged that the Bureau violated the National Environmental Policy Act (“NEPA”), 42 U.S.C. §§ 4321-4347, by implementing the strategy without first preparing an environmental impact statement, Am. Compl. ¶¶ 89-91, and that the Bureau violated the Wild Horses and Burros Act by adopting a strategy that would reduce herd populations to below their appropriate management levels. Id. ¶¶ 92-94.[3] The complaint also objected to seven specific gathers of wild horses and burros carried out after Congress appropriated the funds. Id. ¶¶ 95-102.
In February 2002, while the complaint was pending, an assistant director of the Bureau issued an “Instruction Memorandum” to the field offices “to communicate guidance and policy” regarding how the Bureau would achieve AML in herd man-
agement areas by 2005. The memorandum included a chart containing an “estimate” for each state of the number of horses to be removed; stated that horses five years and younger would be removed first, those ten years and older next, followed by horses six to nine years of age; and outlined the data field offices must collect on each herd in order to prepare “Population Management Plans,” which “will detail the population objectives for the herd(s) and the rationale for those objectives.” The instruction memorandum stated that it would be “effective for all gathers beginning upon receipt and will expire on September 30, 2003.” The Bureau’s Manual specifies that instruction memoranda “are of a short-term, temporary nature” and are “in effect for a short period of time.” The February 2002 memorandum explained that the Bureau’s policy regarding the removal of wild horses is “reviewed and revised each year in an effort to balance the need to achieve AML, minimize the time excess animals are held in BLM facilities awaiting adoption and enhance our ability to place those animals into private maintenance and care.”
After the Instruction Memorandum issued, the Fund filed a “Supplemental Complaint” alleging that before the memorandum became effective the Bureau was bound to issue an environmental impact statement or an environmental assessment. The supplemental complaint sought a preliminary and permanent injunction ordering the Bureau not to take any steps to implement the memorandum and directing it to prepare an environmental impact statement pursuant to NEPA.
Insofar as the action dealt with the strategy, the district court dismissed for *18 lack of subject matter jurisdiction, finding that the strategy was not a reviewable “final agency action.” Fund for Animals v. Bureau of Land Mgmt., 357 F.Supp.2d 225, 229 (D.D.C.2004). As to the specific removal actions, the district court found that the Fund’s challenges were moot. Id. at 230.
II.
The Fund takes exception to several of the Bureau’s policies for carrying out its wild horse and burro management duties. The federal courts are not authorized to review agency policy choices in the abstract. In the absence of a specific statutory review provision — neither the Wild Horses and Burros Act nor NEPA contains one — the Administrative Procedure Act provides a generic cause of action to “[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.” 5 U.S.C. § 702 (emphasis added). Review under the APA is further limited to “final agency action for which there is no other adequate remedy in a court.” Id. § 704 (emphasis added). Whether there has been “agency action” or “final agency action” within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable.[4] See Nat’l Ass’n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C.Cir.2005); DRG Funding Corp. v. Sec’y of Housing & Urban Dev., 76 F.3d 1212, 1214 (D.C.Cir.1996).
The Fund cites two documents that it claims are final- agency action. One of these documents is the “Instruction Memorandum” issued by the Bureau’s Assistant Director for Renewable Resources and Planning. This memorandum “communicate[s] guidance and policy on how BLM will achieve AML on all HMA’s [sic] by 2005.” By its terms, the memorandum — a “short-term, temporary” document according to the Bureau’s manual — expired on September 30, 2003.[5] In its Supplemental Complaint, the Fund claims only that the memo was issued in violation of NEPA. Because the memo has expired, this claim is moot. See In re Bluewater Network, 234 F.3d 1305, 1314 (D.C.Cir.2000) (“Petitioners do not here challenge the 1997 temporary regulations, either for what they did or did not do; those regulations have expired. Whatever issues could have been raised regarding their legality are moot.”); see also Worth v. Jackson, 451 F.3d 854, 860-61 (D.C.Cir.2006). The government’s concession that “the general na *19 tional planning approach set forth in the February 2002 memorandum continues to serve as guidance to the field for the conduct of specific gather and removal decisions,” Br. of Appellees 25 n.6, cannot support the weight the Fund would place on it.[6] The “general national planning approach” is the same approach put forward in the budget document, which we discuss next.
This leaves the Fund with the “FY 2001 Presidential Budget Initiative.” On its surface, the document was a budget request to Congress. The record confirms that it was intended as such. In the face of mounting pressure to fix systemic problems in the Wild Horse and Burro Program, the Bureau determined that it could do so only with additional funding. The Budget Initiative explains why the current funding amount is insufficient for the Bureau to achieve appropriate management levels. To justify its request for an additional “$9,000,000 [per] year over current funding levels sustained through 2005,” the Budget Initiative lays out the key elements of the Bureau’s “strategy”: a four year gather schedule for all HMAs, removal of animals without age restrictions, a removal target of 12,855 animals in the first year and then a significant drop-off, enhanced marketing of animals and adoption events, training and gelding difficult-to-adopt animals, and long-term pasturing for unadoptable animals. Congress approved this request by appropriating the needed funds in 2001 and 2002.[7] See J.A. 101; Dep’t of the Interior and Related Agencies Appropriations Act of 2001, Pub.L. No. 106-291, tit. I, 114 Stat. 922, 922-23 (2000); Dep’t of the Interior and Related Agencies Appropriations Act of 2002, Pub.L. No. 107-63, tit. I, 115 Stat. 414, 414-15 (2001).
The Bureau’s approved budget request is not “agency action” within the meaning of § 702, much less “final agency action” within the meaning of § 704. The APA defines an “agency action” as “the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof.” 5 U.S.C. § 551(13). This list is expansive. It is “meant to cover comprehensively every manner in which an agency may exercise its power.” Whitman v. Am. Trucking Ass’ns, Inc., 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). But we “have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.” Indep. Equip. Dealers Ass’n v. EPA 372 F.3d 420, 427 (D.C.Cir.2004) (internal quotation marks and alteration omitted). Much of what an agency does is in anticipation of agency *20 action. Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs. Id.
Budget requests seek funding for an agency to exercise its power. Once Congress appropriates the funds, the agency must determine how to use the money consistent with the appropriation. The agency’s proposal to Congress, developed to secure the funds, may serve as a useful planning document, but it is not a “rule”— that is, “an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.” 5 U.S.C. § 551(4). It does not “implement, interpret, or prescribe” any “law or policy.” See Indep. Equip. Dealers Ass’n, 372 F.3d at 428; see also Indus. Safety Equip. Ass’n v. EPA, 837 F.2d 1115, 1120 (D.C.Cir.1988). And it is not an “order,” or a “license,” or a “sanction,” or “relief.” 5 U.S.C. § 551(13). The most that can be said is that it outlines the goals and methods of an administrative program. The Wild Horses and Burros Program, according to the “FY2001 Presidential Budget Initiative,” proposed rounding up 12,855 animals in its first year, trying to market those animals through adoption events, and so on. Judicial review of such budget initiatives would wreak havoc with the normal operations of agencies and .the executive branch. Agencies propose all kinds of programs in the budget process, and' they are not the only actors in that process. The President decides which agency budget requests to forward to Congress. See Judicial Watch v. Dep’t of Energy, 412 F.3d 125, 129-30 (D.C.Cir.2005). This is doubtless why the Bureau’s proposal was called a “Presidential Budget Initiative.” It is impossible to believe that the APA opened this process to judicial scrutiny as a reviewable “agency action.”
To rule otherwise would be contrary to Lujan v. National Wildlife Federation, 497 U.S. 871, 890-94, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Courts may “intervene in the administration of the laws only when, and to the extent that, a specific ‘final agency action’ has an actual or immediately threatened effect.” 497 U.S. at 894, 110 S.Ct. 3177. The individual roundups might qualify; the Bureau’s budget proposal does not. When the Bureau sought funding from Congress, it did not harm or affect the plaintiffs in this case; and they were not harmed or affected when Congress appropriated the $9 million. This is very unlike a substantive rule that, as a practical matter, requires the parties affected to adjust their conduct as soon as the rule is issued. The budget request is a broad “programmatic” statement that Lujan keeps from our review. Id. at 891, 110 S.Ct. 3177.
Unlike “circumscribed, discrete agency actions” that are the ordinary subjects of judicial review, Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 62, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004), the Bureau’s strategy represents the sum of “many individual actions,” including some “yet to be taken.” Lujan, 497 U.S. at 893, 110 S.Ct. 3177; see also Cobell v. Norton, 240 F.3d 1081, 1095 (D.C.Cir.2001); Indep. Petroleum Ass’n of Am. v. Babbitt, 235 F.3d 588, 595 (D.C.Cir.2001). The Fund identifies four “elements” of the Budget Initiative that it claims “require specific agency conduct”: removing animals to achieve AML in all HMAs, implementing a four-year gather schedule, removing animals regardless of age, and reducing populations to forty percent below AML. Even if the Bureau’s budget request were somehow considered to be a regulation — the Bureau disputes that these “elements” of *21 the strategy are binding upon the field offices actually making gather decisions— there must still be “some concrete action applying the regulation to the claimant’s situation in a fashion that harms or threatens to harm him.” Lujan, 497 U.S. at 891, 110 S.Ct. 3177. As we have said, the cited “elements” had no such consequence.[8]
The budget proposal represents the Bureau’s latest plan to comply with its broad statutory mandate. The Supreme Court addressed an analogous situation in Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 61-65, 124 S.Ct. 2373.[9] The Court reiterated the point that before there may be judicial review there must be a “discrete” “agency action.” Id. at 62, 64, 124 S.Ct. 2373. In a portion of the opinion that almost seems to anticipate this case, the Court hypothesized a plaintiff who alleged “that the Secretary had failed to ‘manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance.’ ” Id. at 67, 124 S.Ct. 2373 (quoting 16 U.S.C. § 1333(a)). “The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives,” the Court stated, “is not contemplated by the APA.” Id. Yet that is precisely the step that the Fund asks us to take in this case.
Both Lujan and Southern Utah were suits challenging land use plans formulated pursuant to the Federal Land Policy and Management Act of 1976, and the Act’s mandate to “manage the public lands un-
der principles of multiple use and sustained yield.” 43 U.S.C. § 1732(a). The Court held that the plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny. “[A] land use plan is generally a statement of priorities; it guides and constrains actions, but does not ... prescribe them.” Southern Utah, 542 U.S. at 71, 124 S.Ct. 2373. The Wild Horses and Burros Act thus directs the Secretary to manage the animals “as an integral part of the natural system of the public lands,” 16 U.S.C. § 1331, “to achieve and maintain a thriving natural ecological balance on the public lands,” id. § 1333(a), and to “preserve and maintain ... [a] multiple-use relationship” with the land, id. § 1332(f)(2). The Bureau carries out its wild horse and burro management duties as part of the broader land use planning process. See 43 C.F.R. § 4700.0-2 (“The objectives [of the program] are management of wild horses and burros ... under the principle of multiple use .... ”); id. § 4700.0-6(b) (“Wild horses and burros shall be considered comparably with other resource values in the formulation of land use plans.”); id. § 4710.1 (“Management activities affecting wild horses and burros ... shall be in accordance with approved land use plans .... ”). The budget initiative reflects land use planning. It contains the outlines of a reinvigorated wild horses and burros program and sets broad goals and strategies. Like the land use plans in Lujan and Southern Utah, it is “[a] state *22 ment by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities.” Southern Utah, 542 U.S. at 71, 124 S.Ct. 2378. As such, it “cannot be plucked out of context and made a basis for suit” under the APA. Id.
Our conclusion that the Bureau’s budget request is not reviewable under the APA is of a piece with this court’s consistent refusal to review agency orders “that do[] not [themselves] adversely affect complainant but only affect[] his rights adversely on the contingency of future administrative action.” DRG Funding Corp., 76 F.3d at 1214 (internal quotation marks omitted); see, e.g., Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm’n, 324 F.3d 726, 731-33 (D.C.Cir.2003); AT & T Co. v. EEOC, 270 F.3d 973, 975-76 (D.C.Cir.2001). As is the case with more formal land use plans, there is “considerable legal distance” between the appropriation of funds to implement a gather “strategy” and the actual removal of wild horses and burros. Ohio Forestry Ass’n, Inc. v. Sierra Club, 523 U.S. 726, 730, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). The field office responsible for a particular herd management area must conduct its own surveying and land use planning; it must propose a gather and provide notice to interested parties; if those parties object, it must consider their objections and render a . decision. Although the “strategy” likely guides this process, it does not carry the legal significance the Fund assigns to it. The elements of the strategy to which the Fund objects “do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations.” Id. at 733; 118 S.Ct. 1665. Our long-standing practice in circumstances like this is to require the complaining party to challenge the specific implementation of the broader agency policy.
III.
The Fund’s complaint did object to seven specific gathers allegedly carried out “in accordance with the Restoration Strategy.” Am. Compl. ¶¶ 95-102. The Fund requested relief — “permanently enjoining [the Bureau] from taking any further steps to implement its Restoration Strategy,” id. at 30 — that can fairly be read to include an injunction against carrying out the specified removal actions. But those gathers have been completed. It is “impossible for the court to grant any effectual relief whatever” with respect to the challenged gathers. Beethoven.com LLC v. Librarian of Cong., 394 F.3d 939, 950 (D.C.Cir.2005) (internal quotation, marks omitted). They cannot be undone.
This aspect of the ease cannot be saved from mootness on the ground that it raises “issues or wrongs capable of repetition yet evading review.”[10] People for the Ethical Treatment of Animals, Inc. v. Gittens, 396 F.3d 416, 421 (D.C.Cir.2005) (“PETA”) (internal quotation marks omitted). Particular decisions to remove wild horses and burros are highly fact-specific. How a herd will be managed in the future after the initial culling is anyone’s guess, as the Bureau makes clear. It may de *23 pend on climate, on how many new births occur, on the mortality rate of the horses, on whether fertility control is used as a management tool, and on many other factors specific to a herd and to the area in which it is located. Once appropriate management levels have been achieved, the “schedule for maintaining those AMLs will be developed based on the individual needs of each herd.” If there are to be more roundups in the future — itself an open question — it remains to be seen whether they will be of the same magnitude as those which have come before, and whether the same criteria are applied. As in PETA, the “essential point is that the case before us is highly dependent upon a series of facts unlikely to be duplicated in the future,” id. at 424, particularly since the 2001 budget request proposed only a four-year gather program.
*1* ^
Because the Fund does not challenge any justiciable agency action, the judgment of the district court is affirmed.

So ordered.

. All young and healthy horses so removed are made available for adoption and transferred to private owners after the owners have demonstrated that the horses or burros will be treated humanely. 16 U.S.C. § 1333(b)(2)(B), (c): Other animals removed from the public lands are destroyed, id. § 1333(b)(2)(A), (C), sold in certain circumstances, id. § 1333(e), or placed in private long-term pasturing arrangements.

. The Bureau had, in the past, concentrated on removing younger animals in order to maximize adoptions.

. The Fund also challenged the Bureau’s "pattern, practice and policy of removing wild horses and burros pursuant to the Restoration Strategy.” Am. Compl. ¶ 103 (emphasis added). Because this claim is not independent of the strategy, we do not address it separately.

. Although the final agency action requirement "has been considered jurisdictional” because, without it, "the court ... cannot reach the merits of the dispute,” DRG Funding Corp. v. Sec'y of Housing & Urban Dev., 76 F.3d 1212, 1214 (D.C.Cir.1996), the APA grants a cause of action rather than subject matter jurisdiction, see Califano v. Sanders, 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The district court therefore erred in dismissing the Fund's claim for lack of subject matter jurisdiction pursuant to Fed R. Civ. P. 12(b)(1). The error is of no consequence: "[E]ven though there was no basis for dismissal under Rule 12(b)(1), we may properly affirm the District Court's judgment pursuant to Rule 12(b)(6).” Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm’n, 324 F.3d 726, 731 (D.C.Cir.2003). Because the parties presented "matters outside the pleading,” which the district court did not exclude, Fed. R. Civ. P. 12(b), the court should have treated the motion to dismiss as a motion for summary judgment.

. As the memorandum itself makes clear, the Bureau's selective removal policy regarding wild horses is "reviewed and revised each year in an effort to balance the need to achieve AML, minimize the time excess animals are held in BLM facilities awaiting adoption and enhance our ability to place those animals into private maintenance and care,” which is doubtless why the memorandum was in effect for such a short period of time.

. Neither can it support our partially dissenting colleague's argument. The government notes that “the record provides no evidence of [the Memorandum’s] continued implementation.” Br. of Appellees 25 n.6. The absence of record evidence does not create a genuine issue of material fact. This is especially so with respect to questions of mootness. See, e.g., Sierra Club v. EPA, 292 F.3d 895, 899 (D.C.Cir.2002); Foretich v. United States, 351 F.3d 1198, 1210 (D.C.Cir.2003). The Fund states in a footnote that "BLM has never claimed that it is no longer implementing the ... Memorandum.” Br. of Appellants 12 n.4. This is hardly "evidence” that the expiration date does not mean what it says.

. This in itself poses a problem for the Fund: If Congress approved an agency program, how can it be that a court should review the program to determine if it complies with federal law? “Congress may ratify an agency action through appropriation acts.” Schism v. United States, 316 F.3d 1259, 1289 (Fed. Cir.2002) (en banc). Because the appropriations here did not identify the Wild Horses and Burros Program as a line item, however, we hesitate to read too much into Congress's action. See id. at 1290-91 (requiring clear statement of congressional approval).

. The budget initiative is therefore quite unlike the policy guidance we reviewed in Appalachian Power Co. v. EPA, 208 F.3d 1015 (D.C.Cir.2000). EPA's guidance document amounted to a legislative rule — subject to notice-and-comment rulemaking — because it required the parties affected to adjust their conduct as soon as it was announced. See id. at 1023, 1028.

. Although the complainants in Southern Utah sought to compel agency action allegedly withheld, see 5 U.S.C. § 706(1), the Court's reasoning applies with equal force to claims regarding action taken under § 706(2). The Court stated that the requirement of discrete "agency action” is the same regardless whether a plaintiff challenges alleged action taken or withheld. See Southern Utah, 542 U.S. at 64-65, 124 S.Ct. 2373.

. Although the Fund did not press this specific exception to the mootness doctrine in the district court, it did so in this court. As the Bureau rightly conceded at oral argument, this court has authority to address the exception as a matter of our Article III jurisdiction. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).