# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 1, 2025   Decided February 20, 2026

No. 24-5155

FRIENDS OF ANIMALS,
APPELLANT

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, AN AGENCY
OF THE UNITED STATES AND STATE OF UTAH,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02029)

*Jennifer Best* argued the cause for appellant. With her on the briefs was *Stephen Hernick*.

*Ezekiel A. Peterson*, Attorney, U.S. Department of Justice, argued the cause for appellee U.S. Bureau of Land Management. With him on the brief were *Adam R.F. Gustafson*, Acting Assistant Attorney General, and *Robert Lundman*, Attorney. *Rebecca Jaffe*, Attorney, entered an appearance.

*Steve Geary*, Assistant Solicitor General, Office of the

Attorney General for the State of Utah, argued the cause for appellee State of Utah. With him on the brief were *Derek Brown*, Attorney General, and *Stanford Purser*, Solicitor General.

Before: KATSAS and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 (the "Act"), authorizes and directs the Bureau of Land Management ("BLM") "to protect and manage wild free-roaming horses and burros as components of the public lands." *Id.* § 1333(a). Pursuant to this role, BLM is responsible for culling the wild horse population on public lands to promote their long-term sustainability. In assuming this responsibility, BLM is obliged to adhere to certain statutory requirements that were enacted to ensure the protection of wild horses.

The dispute in this case is focused on "ten-year plans" that were issued by BLM to manage wild horse populations on public lands. These plans authorize BLM to gather and remove wild horses from four different geographic areas during the course of a ten-year period. In August 2018, Appellant, Friends of Animals, filed a lawsuit in the District Court against BLM under the Administrative Procedure Act ("APA") initiating a challenge to the ten-year plans. In pursuing this action, Appellant claimed that the contested plans should be struck down because they impermissibly "allow BLM to conduct an indefinite number of subsequent removals of wild horses despite (1) not identifying a specific overpopulation or excess horses that need to be removed, (2) not making excess

determinations based on current information, and (3) not consulting with independent parties." Appellant's Br. 2. According to Appellant, "[n]othing in the [Act] . . . authorizes BLM to issue long-term, open-ended [plans] to continually roundup and remove an undisclosed number of wild horses at unknown times over the course of ten years." *Id.* at 23. BLM responded that nothing in the Act prohibits it from authorizing multiple gathers over a period of years in a single plan.

The District Court found merit in some of the claims advanced by Appellant. In particular, the court held unlawful and vacated each of the contested ten-year plans to the extent that each authorized additional gathers after the plan has achieved the stated population goal for a specified geographic area. *See Friends of Animals v. BLM*, 728 F. Supp. 3d 45, 80-81 (D.D.C. 2024). No party contests this judgment. The District Court also held that the ten-year plans are unlawful to the extent they authorize future gathers that disregard the Act's "duty to act promptly and to ensure that gather decisions are informed by current information and consultation." *Id*. at 81. No party contests this judgment. The District Court then remanded the case to BLM to "revise" each of the contested plans "to clarify which future gathers will require further process before they can proceed." *Id.* at 79 (citation omitted); *see also* Joint Appendix ("J.A.") 406. Therefore, the parties' principal disagreements were left unresolved by the District Court pending remand.

Appellant now appeals, seeking to invoke this court's jurisdiction under 28 U.S.C. § 1291. However, that section limits our jurisdiction to "*final decisions* of the district courts of the United States," 28 U.S.C. § 1291 (emphasis added), and controlling case law instructs us that "a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291," *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550

F.3d 16, 19 (D.C. Cir. 2008) (citations omitted). In this case, the District Court ordered BLM to reconsider Appellant's claims on remand. BLM must "adopt reasonable limitations regarding when (and with what information in hand) it may conduct follow-on gathers before achieving [the target population] for each of the four [ten-year plans]." J.A. 406; *see also Friends of Animals*, 728 F. Supp. 3d at 81.

The District Court's order remanding the case to the agency was not a final decision under 28 U.S.C. § 1291. Therefore, on the record before us, we are required to dismiss this appeal for lack of subject-matter jurisdiction.

## I. BACKGROUND

### A. *Wild Free-Roaming Horses and Burros Act*

Congress enacted the Wild Free-Roaming Horses and Burros Act in 1971 to preserve and protect wild free-roaming horses and burros. Congress believed that doing so would "enhance and enrich the dreams and enjoyment of future generations of Americans." H.R. REP. NO. 92-681, at 7 (1971) (Conf. Rep.). To that end, the 1971 enactment only permitted BLM to destroy horses or burros "because of overpopulation" if it determined that "such action [was] the only practical way to remove excess animals from the area." Pub. L. No. 92-195 § 3(c), 85 Stat. 649, 650 (1971).

Congress soon realized that the 1971 law may have overreached in pursuing its goal of protecting wild horses and burros. The legislative history underlying the 1978 amendments to the Act notes that wild horses and burros had "exceed[ed] the carrying capacity of the range" and "pose[d] a threat to their own habitat" as well as other wildlife and rangeland values. H.R. REP. NO. 95-1122, at 2 (1978).

Although Congress remained committed to "protecting wild free-roaming horses and burros from capture, branding, harassment, or death," it also recognized the necessity of "facilitating the removal and disposal of excess wild free-roaming horses and burros." *Id.* Congress enacted the 1978 amendments to serve both goals.

The amended Act directs BLM, as delegate for the Secretary of the Interior, to "protect and manage wild free-roaming horses and burros . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a); *see also id.* § 1332(a). To carry out these responsibilities, the Act tasks BLM with "maintain[ing] a current inventory of wild free-roaming horses and burros" in order to:

> [1] make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals;
> [2] determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and
> [3] determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

*Id.* § 1333(b)(1). "In making such determinations[,]" BLM must consult with state and federal wildlife agencies, independent individuals recommended by the National Academy of Sciences, and "such other individuals" with "scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management." *Id.*

BLM has some discretion in determining whether an overpopulation of horses exists and whether removal is necessary. However, once it has made an excess and necessary-to-remove determination based on the statutorily required information, it must act "immediately" to remove excess wild horses. The Act states:

> Where the Secretary determines on the basis of (i) the current inventory of lands within his jurisdiction; (ii) information contained in any [statutorily required] land use planning . . . ; (iii) information contained in court ordered environmental impact statements . . . ; and (iv) such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i–iv) above on the basis of all information currently available to him, that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels.

*Id.* § 1333(b)(2). BLM must take action in the "order and priority" specified by the Act, "until all excess animals have been removed." *Id.*

BLM carries out its functions under the Act in "localized 'herd management areas' ('HMAs')." *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006) (citations omitted). For example, BLM determines and sets appropriate management levels ("AMLs") for each herd management area. The AML is the number of wild horses that achieves "a thriving natural ecological balance" and is usually expressed as a range.

BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, BLM HANDBOOK H-4700-1, WILD HORSES AND BURROS MANAGEMENT HANDBOOK 17 (2010), J.A. 856. BLM then monitors population levels in each HMA or "Complex," a group of HMAs managed collectively, to determine whether AML is being achieved. As mentioned, if based on current inventory and other applicable information, BLM makes a determination that an overpopulation exists and removal is necessary, the agency must act promptly to remove excess animals.

Prior to taking action, BLM must create a gather plan that includes a site-specific environmental analysis compliant with the National Environmental Policy Act. *See* 42 U.S.C. § 4332(2)(C); BLM, WILD HORSES AND BURROS MANAGEMENT HANDBOOK at 47-48, J.A. 857-58. A gather plan often includes alternative proposed actions. BLM then issues a decision record that documents the excess and necessary-to-remove determinations, adopts a proposed action from the gather plan, and provides a rationale for the selected action. BLM typically implements gathers pursuant to a final decision record.

**B.** *Ten-Year Plans*

"Historically, after making an excess determination and explaining why removal is necessary, BLM would issue a gather plan that authorized a single gather and removal operation." Br. for Fed. Appellee 8 (cleaned up). In other words, each decision record gave BLM one attempt to bring the wild horse population to AML, and, if that attempt failed, BLM would have to restart the entire regulatory process. BLM explains that, over time, this approach proved untenable. As wild horse populations continued to grow, it became

"impracticable" for BLM to achieve AML in a single gather. *Id.* The resource and logistical challenges were too great.

BLM decided to follow a "longer-term approach" when aiming to achieve AML. *Id.* BLM thus adopted gather plans that authorize it to conduct as many removal operations as necessary to achieve and maintain AML over a ten-year time horizon in each HMA or Complex.

At issue on appeal are four decision records approving ten-year gather plans for the following geographies: the Eagle Complex, the Onaqui Mountain HMA, the Muddy Creek HMA, and the Pine Nut Mountains HMA. We refer to the four decision records at issue as the "ten-year plans." Each of the ten-year plans contains an excess and necessary-to-remove determination and approves a gather plan that authorizes BLM to gather and remove horses over the course of ten years to achieve and then maintain the population within the region's approved AML range. The AML ranges for all four areas were approved prior to their inclusion in the ten-year plans and are not at issue in the present proceeding.

### 1. Eagle Complex

The Eagle Complex consists of three HMAs: the Eagle, Mount Elinore, and Chokecherry HMAs. In August 2018, BLM issued the decision record for the Eagle Complex. BLM estimated that 2,220 wild horses were then-present in the region and determined that removal was necessary to achieve the approved AML range of 145-265 wild horses. The decision record approves a gather plan that authorizes the relevant field offices to gather and remove approximately 90% of the existing horses and to return as needed over ten years to achieve and maintain the AML range.

BLM has completed several gather operations in the Eagle Complex HMAs pursuant to the decision record. Although more than 2,500 wild horses have been removed from the Complex, the March 2025 population estimate was 2,400 wild horses.

### 2. Muddy Creek HMA

BLM issued the decision record for the Muddy Creek HMA in July 2018. At that time, BLM estimated that 224 wild horses were present in the region and determined that removal of excess horses was necessary to bring the population within the approved AML range of 75-125 wild horses. The decision record approves a gather plan that authorizes an initial gather and subsequent maintenance gathers to be conducted in the Muddy Creek HMA for ten years from the date of the initial gather to achieve and maintain the low end of the AML range.

BLM conducted a gather and removal operation pursuant to the decision record in September 2018, bringing the region's wild horse population near the low end of the AML range. BLM represented that it "will not conduct any further gather and removals in the Muddy Creek HMA under the [d]ecision [record] challenged here." Br. for Fed. Appellee 20.

### 3. Onaqui Mountain HMA

When BLM issued the decision record for the Onaqui Mountain HMA in December 2018, the estimated wild horse population was approximately 510 animals. BLM determined that removal of excess wild horses was necessary to bring the population within the approved AML range of 121-210 wild horses. The decision record adopts a gather plan to initially remove 465 wild horses and then authorizes BLM to "return periodically over a period of ten years to maintain AML." J.A.

587. The adopted gather plan also authorizes BLM to return to the HMA to remove excess horses above the low end of the AML range if the initial gather fails to do so.

BLM began an initial gather in September 2019 and conducted a subsequent gather in July 2021. As of March 2025, the population was still estimated to exceed AML at approximately 315 wild horses.

### 4. Pine Nut Mountains HMA

BLM issued the decision record for the Pine Nut Mountains HMA in November 2017. At the time, the estimated wild horse population was about 700 animals, which BLM determined was in excess of the approved AML range of 118-179 wild horses. The decision record adopts a gather plan to, over the course of ten years, "achieve and maintain a population size within the established AML." J.A. 689.

The initial gather conducted pursuant to the decision record began in February 2019 and was completed in July 2019. BLM estimates that 383 wild horses were gathered and removed, but the population still exceeded AML at 317 wild horses as of March 2025.

### C. *Procedural History*

The District Court's decision at issue on appeal is far from "the first chapter in this long-running dispute, which has already generated two lengthy opinions, and four versions of Plaintiff's complaint." *Friends of Animals*, 728 F. Supp. 3d at 59 (citations omitted). We summarize the aspects of the saga that are relevant to the pending appeal.

Appellant's operative complaint against BLM challenged the lawfulness of the four decision records described above, *i.e.*, the ten-year plans. The State of Utah moved to intervene, and the District Court granted that motion. All parties moved for summary judgment.

Appellant argued that the ten-year plans exceed BLM's authority under the Act and should be held unlawful and set aside pursuant to the APA. In Appellant's view, the Act does not permit BLM to issue "long-term, open-ended roundup decisions" because the Act requires BLM to make separate excess and necessary-to-remove determinations for each gather operation, to make each of those determinations based on "current information and consultation with independent parties" and, after making such determinations, to "immediately" remove excess animals but only until AML has been achieved. Plaintiff's Cross-Motion for Summary Judgment at 7-8, Friends of Animals v. BLM, No. 1:18-cv-02029 (D.D.C. Oct. 21, 2022) (citation omitted).

The District Court declined to hold the ten-year plans "facially unlawful merely because they authorize multiple gathers over a period of years." *Friends of Animals*, 728 F. Supp. 3d at 79. At the same time, the court found some merit to a number of Appellant's arguments and agreed that aspects of the challenged plans require reconsideration.

First, the District Court held that after BLM has achieved AML in a particular HMA or Complex, the Act does not permit BLM to continue conducting gathers to "maintain" the population without issuing a new gather plan and decision record. The court explained that after BLM has made an excess and necessary-to-remove determination, the Act "authorizes [BLM] to remove excess animal[s] only to the extent needed 'to achieve appropriate management levels' and only 'until all

excess animals have been removed so as to restore' the range." *Id.* at 78 (quoting 16 U.S.C. § 1333(b)(2)). The court added that because BLM's authorization to continue a gather ends when it achieves AML, any subsequent gather to "maintain" the population is, effectively, premised on a *new* determination that an overpopulation or excess of animals exists. Thus, BLM must undertake the full statutory process to make the requisite determinations. Accordingly, the District Court vacated each of the ten-year plans to the extent it authorizes BLM to conduct additional gathers in the region after AML has been achieved.

Second, while the District Court found the precise "line . . . more difficult to draw based on the existing record," it held that the ten-year plans "are also unlawful to the extent that they authorize future gathers that are not conducted as promptly as reasonably possible or that authorize future gathers even where, by the time those gathers occur, [BLM] knows (or has reason to know) that they are based on information or consultations that are materially out-of-date." *Id.* at 79.

The court explained that the Act "places a premium on 'current' information" and "requires [BLM] to act based on the best information that is currently available to it." *Id.* at 72. And while "[t]hat requirement does not preclude staged gather plans," it also does not permit BLM to "disregard significant information that comes to its attention even before it has achieved AML." *Id.* Accordingly, the court also agreed with Appellant that "a point may come when, based on all information then-available," BLM may have to consider whether completing a staged gather is unnecessary and thus unauthorized under an existing plan. *Id.* at 73. Similarly, the court recognized that given the Act's "clear" directive that BLM consider and take "seriously" expert input, "there may be limits on [BLM's] authority to use a multi-year gather plan as a means of circumventing the consultation requirement." *Id.* at

73-74 (citation omitted). Last, the court was not persuaded that the Act requires BLM to "immediately" achieve AML after making an excess and necessary-to-remove determination. *Id.* at 77. However, the District Court heeded this court's observation that the Act requires "prompt action" and "thus directs that excess horses should be removed *expeditiously*." *Id.* (cleaned up) (quoting *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982)). Applying that directive, the court found that the Act does not permit BLM "to take an entire decade to act." *Id.*

In short, the court found that the ten-year plans had gone too far. The court explained that BLM "may not grant itself carte blanche to conduct gathers many years from now, without regard to the statutory requirements." *Id.* at 79. However, recognizing that BLM "is better situated than the court to draw those lines in the first instance," *id.* (cleaned up) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)), the court remanded to BLM to "adopt reasonable limitations regarding when (and with what information in hand) it may conduct follow-on gathers before achieving AML," *id.* at 81. In clarifying the scope of its holding, the District Court observed that "each of the [ten-year] plans appears to leave [BLM] unlimited discretion to conduct gathers intended to achieve AML at any time over the next decade." *Id.* at 80. While the court recognized that BLM "is entitled to some leeway," it also held that BLM may not grant itself blanket authorization "to continue initial gathers for many years to come, notwithstanding the duty to act promptly and to ensure that gather decisions are informed by current information and consultation." *Id.* at 80-81.

All parties filed notices of appeal. BLM and Utah subsequently moved to voluntarily dismiss their appeals, and

this court granted both motions. Only Appellant's appeal remains pending before this court.

## II. ANALYSIS

On appeal, the parties continue to dispute BLM's authority under the Wild and Free-Roaming Horses Act to conduct multiple gather operations over a period of years pursuant to a single decision record. The parties take largely the same positions that they took before the District Court. Appellant continues to assert that the ten-year plans are unlawful because the Act requires BLM to undertake the full statutory process for each gather and removal operation. Meanwhile, BLM maintains that the ten-year plans are lawful because the Act authorizes it to "conduct[] multiple gathers and removals as necessary to achieve AML based on a single excess [and necessary-to-remove] determination." Br. for Fed. Appellee 30.

In addressing these positions, the District Court rendered two principal legal conclusions that are not in dispute on appeal.

First, no party disputes the District Court's holding that the ten-year plans violate the Act to the extent they authorize additional gather operations after the plan has achieved AML. The District Court's order for partial vacatur is, therefore, not at issue on appeal.

Second, no party disputes the District Court's holding that the ten-year plans are "also unlawful to the extent that they authorize future gathers that are not conducted as promptly as reasonably possible or that authorize future gathers even where, by the time those gathers occur, [BLM] knows (or has reason to know) that they are based on information or

consultations that are materially out-of-date." *Friends of Animals*, 728 F. Supp. 3d at 79.

Neither BLM nor Utah maintained its cross appeal, and, therefore, neither may "press arguments that would change or modify the [D]istrict [C]ourt's judgment to [its] benefit." *Shatsky v. Pal. Liberation Org.*, 955 F.3d 1016, 1028 (D.C. Cir. 2020) (citing *Jennings v. Stephens*, 574 U.S. 271, 276 (2015)).

Appellant, for its part, generally urges this court to adopt more decisive holdings in its favor. But Appellant does not contest the District Court's holdings that the ten-year plans are "unlawful" in certain respects and must be revisited on remand. Any disputes between the parties regarding the application of the standards enunciated by the District Court are beyond the jurisdiction of this court to consider. They will be subject to resolution on remand, as necessary.

## A.  *The District Court's Remand Order Is Not Final*

As noted above, Appellant seeks to invoke this court's jurisdiction under 28 U.S.C. § 1291 to challenge the ten-year plans. That section limits our review to "final decisions of the district courts of the United States." 28 U.S.C. § 1291; *see Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). Appellant asserts, and BLM does not dispute, that the District Court's remand order is final and, thus, appealable. However, "[b]ecause the question relates to our jurisdiction to hear the case, we are obligated to conduct an independent inquiry, notwithstanding the parties' agreement." *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 173 (D.C. Cir. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). Having done so, we disagree with both Appellant and BLM. The remand order at issue is not final, and we do not have jurisdiction to review it.

"It is black letter law that a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291." *N.C. Fisheries*, 550 F.3d at 19 (citations omitted). This rule generally forecloses a private party from obtaining immediate appellate review of an order that remands a case to an agency for further proceedings. *See id.* at 19-20; *see also, e.g.*, *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 880 (D.C. Cir. 2000). We have not departed from this rule even where, as here, the district court has declined to vacate the contested agency action. *See, e.g.*, *N.C. Fisheries*, 550 F.3d at 18, 20-21.

In practice, we have recognized only limited exceptions to this rule. These exceptions occur in instances where the remand order effectively terminates the action, *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 385-86 (D.C. Cir. 2017), such as where the order "finally dispose[s]" of the petitioner's claims, *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 515 (D.C. Cir. 2020) (citation omitted), or remands for "solely 'ministerial' proceedings," *Pueblo of Sandia*, 231 F.3d at 881 (compiling cases). "Conversely, if an order does not terminate an action, but instead 'leaves the core dispute unresolved' for 'further proceedings,' it is not final for purposes of § 1291." *Limnia*, 857 F.3d at 385 (cleaned up) (quoting *Am. Haw. Cruises v. Skinner*, 893 F.2d 1400, 1403 (D.C. Cir. 1990)).

Here, it is plain that the District Court did not fully resolve the parties' "core dispute" and that BLM must give further consideration to Appellant's claims on remand. The District Court observed that "each of the [ten-year] plans appears to leave [BLM] unlimited direction to conduct gathers intended to achieve AML at any time over the next decade." *Friends of Animals*, 728 F. Supp. 3d at 80. It added that each plan authorizes future gathers "to be conducted at unspecified times, based on unspecified information and consultation." *Id.* The court found that the Act does not authorize BLM to grant itself

such broad and unfettered discretion to conduct gathers. But it added that "based on the existing record," it could not "draw those lines in the first instance." *Id.* at 79. So, it remanded to BLM to consider the peripheries of its authority under the Act and to incorporate those limits into each of the ten-year plans.

The question of the boundaries of BLM's authority under the Act and how those boundaries map onto the four decision records at issue is the parties' "core dispute" in this case. The District Court provided guidance and set some outer limits. BLM must address the particulars on remand, including "when (and with what information in hand) it may conduct follow-on gathers before achieving AML for each of the four decision records." J.A. 406 (cleaned up); *see also Friends of Animals*, 728 F. Supp. 3d at 81. And it must revise each of the decision records accordingly. BLM is mistaken if it views this exercise as optional. Therefore, it is clear that there is more for the agency to do on remand.

In a circumstance such as this, we cannot view the remand order as final. *See Limnia*, 857 F.3d at 385; *Pueblo of Sandia*, 231 F.3d at 880-81; *see also, e.g.*, *Am. Haw. Cruises*, 893 F.2d at 1402 (stating that a remand order instructing an agency "to engage in reasoned decisionmaking surely [does] not end the litigation on the merits" (citations omitted)). The fact that the District Court described the order as final, purported to relinquish jurisdiction to BLM, and terminated the action from its docket does not change our analysis. *See Limnia*, 857 F.3d at 386 ("[T]hat characterization cannot bind us." (citation omitted)). That is especially true where, as here, the remand order is otherwise "not final in character." *Am. Haw. Cruises*, 893 F.2d at 1403 (cleaned up).

Deferring review of a non-final order "best serves the interests of judicial economy and efficiency." *Pueblo of*

*Sandia*, 231 F.3d at 880 (citation omitted). By declining to interject at this juncture, we refrain from engaging in the "piecemeal appellate disposition of what is, in practical consequence, but a single controversy." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170 (1974). We avoid the prospect of duplicative appeals and, in the meantime, give BLM the opportunity to remediate and perhaps even reach a solution that satisfies all parties without further judicial intervention. *See Pueblo of Sandia*, 231 F.3d at 880.

If Appellant remains aggrieved following remand, it will "be able again to seek judicial review, including review in the court of appeals, raising not only new issues but all those on which it got no satisfaction in its original challenge." *Lakes Pilots Ass'n, Inc. v. U.S. Coast Guard*, 359 F.3d 624, 625 (D.C. Cir. 2004) (citation omitted); *see generally id.* (dismissing for lack of jurisdiction where it was likely that the petitioner's members would "still be aggrieved by the outcome" but would have a subsequent opportunity for review).

### III. CONCLUSION

For the foregoing reasons, we dismiss the case for lack of jurisdiction.

*So ordered.*